## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 23 2020, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of M.H. and K.M. (Minor Children), *Children in Need of Services*;

Q.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 23, 2020

Court of Appeals Case No. 20A-JC-1201

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Jennifer Hubartt, Magistrate

Trial Court Cause Nos.
49D09-1908-JC-2081
49D09-1908-JC-2082

**Pyle, Judge.**

# Statement of the Case

Q.H. ("Mother") appeals the trial court's order adjudicating her sons, M.H. ("M.H.") and K.M. ("K.M.") (collectively "the Children"), to be Children in Need of Services ("CHINS"). Mother specifically argues that there is insufficient evidence to support the adjudication. Concluding that the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the CHINS adjudication, we affirm the trial court.[1]

We affirm.

# Issue

Whether there is sufficient evidence to support the CHINS adjudication.

# Facts

The evidence most favorable to the CHINS adjudication reveals that Mother is the parent of M.H., who was born in April 2009, and K.M., who was born in January 2011. One evening in July 2019, Mother and her husband ("Husband") began arguing. Husband "said [that he] would leave . . . to avoid any confrontation[.]" (Tr. Vol. 2 at 92). As he was walking away from the house, Mother and the Children "came down the street" in Mother's car. (Tr.

---

[1] The Children's father ("Father") is not a party to this appeal. Father attended a CHINS pre-trial conference in August 2019 and told the trial court that he had not seen the Children in four or five years. When the trial court told him that he had a right to parenting time, Father disagreed with the trial court and "voluntarily left the courtroom." (Tr. Vol. 1 at 20). Father did not attend any of the other CHINS proceedings.

Vol. 2 at 92).  Mother was "yelling out the window profanities and trying to hit [Husband] with her car[.]"  (Tr. Vol. 2 at 92).  Mother then "sped up and hit" Husband.  (Tr. Vol. 2 at 93).  Husband bounced off the hood of Mother's car and onto the street.  Mother told a witness "to get out of the way so she could do it again."  (Tr. Vol. 2 at 94).  Husband sought treatment the following day for his calf muscles and tailbone.  As a result of the incident, the State charged Mother with Level 5 felony battery with a deadly weapon and Level 6 felony domestic battery committed in the presence of a child less than sixteen years old.

[4]  Two weeks later, Mother and her two adult sons engaged in an altercation with Brandy Holden ("Holden"), the maternal grandmother of Mother's older son's young child ("the child"), and Holden's family.  The two families were arguing about whether Mother and her sons could take the child.  When Holden noticed that the child was in the back seat of Mother's car with the Children, Holden ran over to the car and attempted to take the child.  However, M.H. had his arms around the child, and, as Holden "was trying to grab [the child], [K.M.] was punching [Holden]."  (Tr. Vol. 2 at 40).  While Mother's adult son attempted to pull Holden out of the car by her neck, Mother got into the car, "put the car in reverse [and] slammed on the gas pedal[.]  [A]t that time [Holden] flew underneath the car, [and Mother] ran Holden over."  (Tr. Vol. 2 at 40).  Mother "proceed[ed] to come back in reverse towards [Holden,] and [Holden's] daughter yanked [Holden] out of the way[.]"  (Tr. Vol. 2 at 40).  Mother and her sons, including the Children, drove away with the child.

Holden had injuries "to both of [her] legs where the tires [had] r[u]n over [them]" as well as a broken toe. (Tr. Vol. 2 at 41). As a result of this incident, the State charged Mother with Level 6 felony criminal recklessness committed with a deadly weapon and Class A misdemeanor battery resulting in bodily injury.

[5] On August 15, 2019, DCS filed a petition alleging that the Children were CHINS based upon Mother's failure "to provide the [C]hildren with a safe, stable, and appropriate living environment free from domestic violence." (App. Vol. 2 at 44). The Children were removed from Mother and placed in foster care. In addition, based upon Mother's criminal charges, the trial court issued a no-contact order preventing Mother from having any contact with the Children.

[6] DCS referred Mother to Families First for a family functioning assessment to determine whether parenting classes were appropriate. DCS also recommended that Mother participate in a domestic violence assessment, home-based case management services, and therapy. In addition, DCS recommended that Mother have supervised parenting time with the Children as soon as the no-contact order was lifted. Mother attended the family functioning assessment but refused to sign a release so that the assessor could send her final report and recommendations to DCS. The assessor was therefore unable to complete the assessment.

[7] In addition, although Mother reported to DCS that the Children suffered from and took medication for a variety of conditions, including food allergies,

asthma, a seizure disorder, autism, depression, and a chromosomal disorder, Mother refused to sign medical releases so that DCS could obtain the Children's medical records. Mother specifically told the DCS that she "knew the [Children's] medical needs best" and did not understand why DCS needed to see the medical records. (Tr. Vol. 2 at 56).

[8]     The trial court heard testimony about these facts at the two-day CHINS factfinding hearing in October 2019. In addition, Husband testified that Mother suffers from bi-polar and post-traumatic stress disorders but refuses to take her prescribed medication. According to Husband, when Mother is not taking her medication, "anybody that tries to help [Mother] is like the enemy." (Tr. Vol. 2 at 96).

[9]     DCS Family Case Manager Maralla Coder ("Case Manager Coder") testified that "it [was] very concerning that Mother ha[d] a pattern of violent behavior." (Tr. Vol. 2 at 113). Another concern that Case Manager Coder had at that time was that Mother was exhibiting erratic behavior, paranoid thinking, and confusing conversations that were difficult to follow. Case Manager Coder further explained as follows:

> [Mother] says that I am not in favor of reunification, that I'm hiding her children from sibling visits because I'm hiding their bruises, that I'm trying to keep her kids away from her and so she wants me off the case. She's trying to - I guess she's filing something with the ombudsmen, she's creating a report to turn into the State where she's asked several times for an ID number of mine that I don't know what that means, she thinks I'm not telling my supervisor to contact her[.]

(Tr. Vol. 2 at 113).

[10] When asked if she believed that Mother would be able to keep the Children safe without the coercive intervention of the court, Case Manager Coder responded that she did not. The case manager specifically pointed out that Mother had not "participated in anything that [DCS had] asked her to do." (Tr. Vol. 2 at 117). In addition, although Mother had told Case Manager Coder that she was seeing a therapist, Mother refused to sign a release of information so that Case Manager Coder could obtain a report from the therapist.

[11] At the end of the CHINS factfinding hearing, Mother asked that a different family case manager be assigned to her case because she was concerned that Case Manager Coder had not been honest with her. In support of her request, Mother told the trial court that, during the CHINS factfinding hearing, Case Manager Coder had told Holden that she was doing a good job on the witness stand. Case Manager Coder denied making the statement, and the trial court declined to order DCS to assign a different case manager to Mother's case.

[12] In November 2019, the trial court issued an order adjudicating the Children to be CHINS. The trial court specifically concluded that the Children's physical or mental condition was seriously impaired or endangered as a result of Mother's refusal to provide them with a safe and stable environment, "free from exposure to serious and dangerously violent situations." (App. Vol. 2 at 176). The trial court further concluded that the Children needed a safe and stable home environment "free from exposure to dangerously violent situations,

which they [were] unlikely to receive without the coercive intervention of the Court." (App. Vol. 2 at 176). The trial court's order scheduled the CHINS dispositional hearing for December 20, 2019.

[13] After the no-contact order had been lifted, Mother began supervised parenting time with the Children. However, one month later, shortly after the trial court had issued its order adjudicating the Children to be CHINS, DCS filed a motion to suspend Mother's parenting time. The motion alleged that Mother had exhibited erratic, paranoid and aggressive behavior during parenting time. DCS advised the trial court that the supervised parenting time provider had withdrawn its services because of safety concerns.

[14] Three days later, Mother's public defenders filed a motion to withdraw from the CHINS case based upon Mother's request. On December 6, 2019, the trial court held a hearing on DCS's motion to suspend Mother's parenting time and the public defenders' motion to withdraw from the case. The trial court found that the supervised parenting time provider was no longer willing to facilitate Mother's parenting time. In addition, the trial court found that, although DCS had sought alternative supervised parenting time agencies to facilitate Mother's parenting time, no agency was willing to accept the case. The trial court granted DCS' motion to suspend parenting time and the public defenders' motion to withdraw from the case.

[15] The following week, DCS filed a predispositional report for the scheduled December 20 dispositional hearing as well as a petition for parental

participation. Two days before the dispositional hearing, Mother's new private attorneys filed their appearances and requested a continuance of the dispositional hearing, which the trial court granted. The trial court rescheduled the dispositional hearing for January 17, 2020. The trial court also authorized supervised parenting time for Mother to be re-instated.

[16] One week before the scheduled dispositional hearing, Mother filed a motion to continue the hearing because she had scheduled a psychiatric evaluation, and her private attorneys were working with DCS to get Mother involved in services before the dispositional hearing. The trial court granted Mother's motion to continue.

[17] In early February 2020, Mother's private attorneys filed a motion to withdraw based on "an irreparable breakdown in the Attorney-Client relationship." (App. Vol. 3 at 27). The trial court granted the motion and ordered the re-appointment of a public defender based upon Mother's request. The trial court rescheduled the CHINS dispositional hearing for March 13, 2020.

[18] In mid-February 2020, Mother orally requested that the trial court appoint a different DCS family case manager to her case. Mother also filed a motion to continue the dispositional hearing because she had not had "adequate communications with her public defender." (App. Vol. 3 at 44). The trial court granted Mother's motion to continue the dispositional hearing and rescheduled that hearing to April 17, 2020.

[19]     In March 2020, the trial court held a hearing on Mother's request for appointment of a different DCS family case manager.  Following the hearing, the trial court issued a detailed order that summarized the case up to that point.  Specifically, the trial court found that Mother's "mental health and past perpetration of domestic violence in the presence of [the Children] [were] central issues which [had to] be addressed in the reunification with [the Children]."  (App. Vol. 3 at 44).  The trial court noted that Mother had presented it with a letter from one of her mental health providers.  The letter stated that Mother would be unable to make progress in her case and toward reunification with her children due to her belief that the Case Manager Coder was biased against her.

[20]     The trial court further found as follows:

> The Court believes that [M]other's belief, founded or unfounded, that the assigned Family Case manager has a personal bias against [M]other will inhibit the reunification process with [the Children].  This process has been delayed at this point due to the numerous continuances of the disposition hearing, which have been requested by [M]other, and the Court finds that it is in the best interest of [the Children] to not delay the process further.

(App. Vol. 3 at 41).  Accordingly, the trial court granted Mother's request for a new DCS family case manager and ordered DCS to appoint the same within seven days.

[21]     In April 2020, the trial court continued Mother's dispositional hearing because of the COVID-19 pandemic.  The trial court held a remote dispositional hearing

in May 2020. Following the hearing, the trial court issued a dispositional order and granted Mother increased parenting time to include a trial basis of in-home parenting time. The Children were returned to Mother's care at the end of June 2020. However, the CHINS case remained ongoing and was not dismissed.

[22] Mother now appeals the trial court's adjudication of the Children to be CHINS.

# Decision

[23] Mother argues that there is insufficient evidence to support the CHINS adjudication. A CHINS proceeding is a civil action. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Therefore, DCS had to prove by a preponderance of the evidence that the Children were CHINS as defined by the juvenile code. *Id*. INDIANA CODE § 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen (18) years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, medical care, education, or supervision; . . . and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[24]    The Indiana Supreme Court has synthesized this statutory language, explaining that a CHINS adjudication requires proof of "three basic elements:  that the parent's actions or inactions have seriously endangered the child[ren], that the child[ren]'s needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[25]    A CHINS adjudication focuses on the child's condition rather than the parent's culpability. *In re N.E.*, 919 N.E.2d at 105.  The purpose of a CHINS adjudication is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.  A CHINS adjudication in no way challenges the general competency of parents to continue relationships with their children. *Id.* at 105.

[26]    When determining whether there is sufficient evidence to support a CHINS determination, we consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom. *In re S.D.*, 2 N.E.3d at 1287.  This Court will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 1286.

[27]    We further note that, as a general rule, appellate courts grant latitude and deference to trial courts in family law matters. *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017).  "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize

their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id.*

[28]     Here, Mother argues that there is insufficient evidence to support the CHINS adjudication. Specifically, she first argues that DCS failed to prove by a preponderance of the evidence that Mother's actions seriously endangered the Children. However, it is well-settled that a child's exposure to domestic violence can support a CHINS adjudication. *Id.* at 984. Additionally, a single incident of domestic violence in a child's presence may support a CHINS finding. *Id.* Here, within a two-week time period, Mother exposed her then nine- and eleven-year-old sons to two incidents of domestic violence when she intentionally hit both Husband and Holden with her car while the Children were in the car. This is sufficient evidence that Mother's actions have seriously endangered the Children.

[29]     Mother also argues that DCS failed to prove by a preponderance of the evidence that the Children's needs were unlikely to be met without State coercion. However, our review of the evidence reveals that Mother had not complied with DCS' requests for information. Specifically, Mother refused to release the results of her family functioning assessment to DCS. Mother also refused to release the Children's medical records to DCS even though both of the Children suffer from several medical conditions. In addition, although Mother had told Case Manager Coder that she was seeing a therapist, Mother refused to sign a release so that Case Manager Coder could obtain a report from the therapist. This is sufficient evidence that the Children's needs were unlikely

to be met without State coercion.  We find sufficient evidence to support the CHINS determination.[2]

[30]    Affirmed.

Vaidik, J., and Brown, J., concur.

---

[2] Mother also argues that she "was denied due process when the trial court refused her repeated requests for an unbiased family case manager." (Mother's Br. 35).  Mother has waived appellate review of this issue because she raises it for the first time on appeal.  *See In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (explaining that Mother waived due process argument because she raised it for the first time on appeal).  Waiver notwithstanding, we find no due process violation here.  The gravamen of Mother's due process argument is that the Children would have been returned to her before June 2020 if the trial court had assigned a new case manager to her case before March 2020.  However, Mother has pointed to no evidence that Case Manager Coder was biased, and we find none.  Rather, our review of the record reveals that Case Manager Coder communicated with Mother, referred Mother to services, and attempted to find a new agency to facilitate Mother's supervised parenting time when the agency that was supervising Mother's parenting time refused to continue the supervised visits because of safety concerns with Mother.  Further, we agree with DCS that "[i]t was Mother's mental health issues, and her inability to get along with those who were trying to help her – including her own court-appointed and private attorneys, the [trial] court, and [Case Manager] Coder – that interfered with the case moving forward."  (DCS' Br. 49).